1

The Honorable Marsha J. Pechman

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

| | |
|---|---|
| ROBERT HICKEY, et al., | NO.  No. C00-1672 MJP |
| Plaintiffs, | DEFENDANTS' OPPOSITION TO THIRD MOTION FOR CLASS CERTIFICATION |
| v. | |
| THE CITY OF SEATTLE, a municipality, et al, | **Noted for Hearing: Friday, February 3, 2006** |
| Defendants. | **Oral Argument Requested** |

## I.  INTRODUCTION

Premised upon any reasoned and fair review of this case's circumstances, plaintiffs' current motion for class certification is grossly premature.  After admitting for six years that there was probable cause to arrest them for violating Order No. 3, plaintiffs have wholly re-invented their claims to allege the City of Seattle ("the City") had an unlawful policy of arrest based on content of speech.  By the very nature of the plaintiffs' claims, certification cannot at this point be granted; the class cannot be defined nor the class members identified.

The abrupt about face in the plaintiffs' class claims is evident from their responses to interrogatories provided in 2002.  Each of the plaintiffs was asked if they claimed injury or damages as a result of violation of civil rights by the City.  Each answered exactly the same: "Yes.  The City's no protest zone policies, created by Emergency Order No. 3."  *Decl. of Ted*

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900 FAX 206.624.6885

*Buck in Supp. of Opp'n. to Class Certification ("Buck Decl."), Exs. 1-5, Interrog. No. 17.*  The Ninth Circuit has determined that Order No. 3 was content-neutral, lawful time, place and manner restriction on speech.  Indeed, it specifically held that anyone who was excluded or arrested for violating Order No. 3 "cannot assert a valid claim individually or as a class member."  <u>Menotti v. City of Seattle</u>, 409 F.3d 1113, 1148, n. 67 (9th Cir. 2005).  The only remaining individual claims that may be asserted are those premised upon a person's exclusion or arrest "solely because of the content of their visible communications . . . ."  <u>Id.</u>

The plaintiffs' problem is they have never claimed their arrests were unlawful for any reason other than the alleged unconstitutionality of Order No. 3.  For example, in responding to the defendant's motion to dismiss defendants Schell and Stamper, the plaintiffs noted:

> To the extent the court treats this as a motion for summary judgment the plaintiffs arrested inside the no protest zone do not oppose the motion.  Those plaintiffs – Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Denise Cooper, and Nicole Pearson – stated claims <u>that were based entirely on the allegation that defendants' policy of excluding protestors from the no protest zone was unconstitutional.  As a result, these plaintiffs acknowledge that unless the court's prior rulings are reversed, plaintiffs Hankin, Hudziec, Lane, Cooper and Pearson do not have currently viable claims against any of the defendants</u> . . . .

*Hickey Dkt. # 89, p. 1 (emphasis added).*  In another brief aimed at postponing their earlier motion to certify a class of everyone arrested pursuant to the "no protest zone" policy, the plaintiffs stated:

> Put simply, plaintiffs' <u>only claims</u> for people who were arrested inside the no protest zone were based on the unconstitutionality of Order No. 3 and the no protest zone.  After Judge Rothstein's summary judgment order and clarification, plaintiffs have no claims left for these people.

*Hickey Dkt. # 78, p. 2 (emphasis in original).*  Nor can the plaintiffs claim confusion as to whether the district court's summary judgment order upholding Order No. 3, which order the Ninth Circuit upheld, disposed of any individual plaintiffs' "as applied" claims.  The plaintiffs specifically sought clarification of the order.  In its responsive order the court expressly noted:

> To the extent clarification is necessary, the consolidated order, and the briefing that proceeded, solely addressed the constitutionality of Emergency Order No. 3

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 2

No. C00-1672 MJP
3019-021525   65582

**STAFFORD FREY COOPER**

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

on its face and "as applied" in the creation of the restricted zone. The court did not rule on the lawfulness of police behavior when arresting individuals. In fact, the court denied defendants' motion for summary judgment on the issue of probable cause to arrest, because plaintiffs raised issues of fact that precluded summary judgment regardless of the constitutionality of Emergency Order No. 3 facially or "as applied" through creation of the restricted zone. The court declines to rule on the legality of these arrests now in the context of a motion to clarify without the benefit of briefing on the individual cases.

*Hickey Dkt. # 77, pp. 2-3.* The very next docket entry was the aforementioned supplemental class certification brief, in which the plaintiffs noted that their "only claims" for people arrested inside the zone were based on the unconstitutionality of Order No. 3. *Hickey Dkt. # 78.*

Contrary to those admissions, the plaintiffs now claim their arrests were improper not due to Order No. 3, but due to some alleged policy of stamping out anti-WTO speech. The plaintiffs' abrupt change of course from their earlier position only compounds the obvious problems with their current motion. As discussed below, because the only possible actionable claims at this stage of the litigation are those based on alleged content-based enforcement, attempting to determine potential class members is impossible. Moreover, absent a showing that the content of their speech was the sole motivation behind their arrests, the plaintiffs do not have standing to pursue individual claims in the wake of the Ninth Circuit's decision – particularly as they admit they violated Order No. 3 and that police clearly had probable cause to arrest them. *See Hickey Dkt. # 81, p. 5* ("[plaintiffs] admittedly violated the Order, but contend it was unconstitutional.) Indeed, the plaintiffs' proposed class definition itself is so hopelessly overbroad that any effort to implement the definition would lead immediately to an inescapable quagmire.

Ultimately, class certification at this stage would only complicate the real issues that the parties face as this stage; specifically, (1) whether the plaintiffs have standing, and (2) if they do, whether the plaintiffs can show that their arrests were the result of a "long standing practice or custom which constitutes the standard operating procedure of the local government entity," the only possible basis upon which these plaintiffs may succeed in their claims. As such, class certification at this juncture is vastly premature, may well be shown to be irrelevant given the overriding liability issues, and, consequently, is a waste of time, money and judicial resources.

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 3

NO. C00-1672 MJP
3019-021525  65582

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

For all these reasons, the court should deny the plaintiffs' motion without prejudice and allow these issues to be resolved before further class certification consideration.

## II.  COUNTER-STATEMENT OF FACTS

### A.      General background facts.

The WTO conference gathered dignitaries and delegates from the 134 member nations to discuss world trade.  Within hours of the official start of the conference, Seattle was faced with a civil emergency as tens of thousand of protestors filled the streets threatening the safety of citizens and protestors, shut down vehicular and pedestrian traffic and vandalized property.   The protestors expressly stated their intention to close down the WTO and make it impossible for delegates to move between their hotels and meetings.  *Menotti Dkt. # 28, 31.*[1]

**Monday, November 29, 1999**

Sporadic protests and acts of vandalism occurred in the weeks leading up to the WTO conference.  *Menotti Dkt. # 29.*  On Monday, November 29, 1999, the day before the official start of the conference, the size and intensity of this activity increased significantly.  *Menotti Dkt. #29, 31, 33.* Unlawful, non-permitted[2] marches were accompanied by spray painted graffiti, window breaking and other acts of vandalism.  *Id.* Demonstrators pounded on windows and cars.  Brawls erupted. Protestors threatened to take over Niketown.  Seattle Police officers were forced to move in and form a perimeter around the store.  The crowd eventually dissipated.  *Menotti Dkt #29***.**

**Tuesday, November 30, 1999**

The WTO conference officially opened.   In the early morning, several large protest groups assembled in various locations within walking distance of the Convention Center, the hub of the WTO meetings.  *Menotti Dkt #31.*  At 7:30 a.m., these groups approached the Convention

---

[1] After the court consolidated the issues in the WTO litigation, it ordered that all documents filed in the consolidated matters be filed in <u>Menotti, et al. v. City of Seattle, et al.</u>, Civil Case No. 00-372. *See Menotti Dkt. #39.*  As such, the <u>Hickey</u> docket does not contain all of the record.  To avoid a cumbersome filing, the City refers to evidence already submitted to the court by docket number.  Where a document only appears in the <u>Menotti</u> docket, the <u>Menotti</u> docket number is referenced.  Documents that appear in both dockets, or only the <u>Hickey</u> docket, are identified by the <u>Hickey</u> docket number.

[2] SMC 15.04.010 provides that "[i]t is unlawful for anyone to make use . . . of any public place without first securing a written permit . . ." <u>Id.</u>

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

Center from all directions. Thousands of demonstrators surrounded the police perimeter established around the Convention Center. Protestors occupied the intersections at 6th and University, 6th and Union, 6th and Pike, 7th and Pine, 8th and Pine, 9th and Pine, Boren/Hubbell/Terry and Pike, and 8th and Seneca.[3] *Menotti Dkt. #29, 30, 32, 33.*

Within 30 minutes, seven distinct, large-scale criminal disturbances occurred within a two-block radius of the Convention Center: (1) 8th and Seneca - protestors chained themselves to manhole covers and set fires; (2) Convention Center - protestors observed carrying bottles filled with flammable liquids; (3) Olive - protestors pushed a Dumpster east down Olive Street; (4) 6th and Pike - 65-100 protestors lay down in street; (5) Boren and Pike - protestors attacked cars, fought, and caused property damage; (6) 8th and Seneca  - approximately 100 protestors jumped on cars; and (7) 9th and Olive - chains strung across intersection from light post to light post. *Menotti Dkt #33.* Protestors spray painted buildings and threw objects at police, including sticks, metal spikes, pieces of concrete, traffic cones, and horse manure. *Menotti Dkt #29, 33.*

Protestors further used force to prevent persons and vehicles from entering or leaving the Convention Center. *Menotti Dkt #29.* They pushed, shoved, pulled, and blocked delegates. *Id.* They prevented fire trucks from entering the area surrounding the Convention Center to extinguish the fires set by the protestors. *Menotti Dkt #29, #32.* Protestors even prevented fire personnel from responding to a fire alarm at a downtown hotel. *Menotti Dkt #29, 32.* Later in the day, protestors prevented fire department medics from coming to the aid of a Seattle Police sergeant who suffered a heart attack, forcing the department to consider a helicopter to evacuation to a hospital only six blocks from the sergeant's location. *Menotti Dkt #33.*

This well-coordinated,[3] early morning protest activity quickly surpassed the capacity of police to simultaneously maintain access to the Convention Center and control lawbreakers. *Menotti*

---

[3] Protestors employed numerous tactics to maintain their positions. This included erecting fences and other obstacles across streets, setting fires, chaining people together and to various objects, and clogging intersections with masses of people. *Menotti Dkt. #29, 30, 31, 33.*

[3] The Seattle Police Department ("SPD") received intelligence that the protestors were color-coded: green = peaceful; purple = distracter; orange, blue and white = civil disobedience. *Menotti Dkt. #39.*

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 5

NO. C00-1672 MJP
3019-021525  65582

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900 FAX 206.624.6885

*Dkt #33.* By 8:00 a.m., the demonstrators succeeded in cutting off vehicular access to the Convention Center and Paramount Theatre, site of the opening ceremonies. *Id.* At 8:48 a.m., the Seattle police venue commander at the Sheraton Hotel reported that WTO delegates were being assaulted and that he was losing control of the situation. *Menotti Dkt #30, 33.* Similar requests for assistance, even rescue, were received from other officers and delegates. *Id.*

The sheer number and volatility of protestors eliminated the possibility of effective, coordinated, area-wide law enforcement activity. Consequently, the field incident commander in charge of demonstration management forces, Captain James Pugel, requested and quickly received a lock down of the Convention Center and Sheraton Hotel. *Menotti Dkt #29, 33.* The City also called for emergency assistance (mutual aid) from other law enforcement agencies. *Id.*. It became apparent that police could not guarantee the safety of the WTO delegates as they moved from venue to venue. At 9:30 a.m., an order was passed through the Seattle Host Organization to keep all WTO delegates in their hotels until order was restored. *Id.*

As officers attempted to clear streets and to provide access to the Convention Center, they observed protestors being coordinated and directed through the use of cell phones and walkie-talkies. *Menotti Dkt. #33.* As the day went on, it was clear that protestors were monitoring the radio communications of the SPD and re-deploying groups of people in response to police actions. When officers used the radio to describe access routes to the Convention Center, those routes would quickly fill with protestors. *Menotti Dkt #32.* Moreover, by monitoring police communications, groups of protestors were able to commit numerous crimes at varied locations with little fear of apprehension. Among other things, they slashed tires, broke windows, and looted local businesses. *Menotti Dkt. #28, 31, 33.* These problems were exacerbated as thousands more people flooded the downtown core in conjunction with the largest demonstration of the day - an organized labor march involving more than 40,000 people. *Menotti Dkt. #33.*

As more people filled the downtown area, the size of the disruptive protests and their attendant level of violence and property destruction increased. *Menotti Dkt. #33.* Protestors pushed

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

dumpsters at police lines after lighting the contents on fire. They threw steel grates and other debris at police. *Menotti Dkt #29, 31.* Others damaged patrol cars. *Menotti Dkt. #29.* Police received calls to help surrounded pedestrians. Cut off or trapped police officers sent "help the officer" calls.[4] *Menotti Dkt. #29, 30, 31, 33.* Throughout the day, delegates were repeatedly assaulted and mauled as they attempted to attend WTO activities. *Menotti Dkt. #29.* One delegate's car was stopped and its tires punctured. *Id.* Some delegates turned to "self-help," drawing handguns to defend themselves. *Menotti Dkt. #31.*

Despite best efforts, police were unable to quell the disturbance, restore vehicular and pedestrian traffic and prevent the continued destruction of property. *Menotti Dkt. #33.* In most instances, officers were unable to leave their posts to pursue and apprehend criminal suspects without jeopardizing their perimeter. *Menotti Dkt. #31, 32, 33.* The Convention Center and other WTO venues were considered the equivalent of foreign embassies that required heightened security to insure the safety of dignitaries and heads of state attending the conference. *Menotti Dkt. #32, 33.* That circumstance and the size and demeanor of the crowds forced police to focus resources on maintaining a perimeter and creating secure corridors for delegates. *Menotti Dkt. #32.* Officers had to concentrate their efforts on the dispersal of crowds rather than on the apprehension of criminal suspects. *Menotti Dkt. #31, #32.* When officers did attempt to leave the perimeter to pursue criminal suspects, they were often forcefully pushed back by protestors. *Menotti Dkt #29.*

In response to the escalating situation and upon the recommendation of police commanders, Mayor Schell declared a civil emergency at approximately 3:30 Tuesday afternoon, pursuant to Seattle Municipal Code Chapter 10.02 and Revised Code of Washington Chapter 38.52. *Menotti Dkt. #28, 32, 33.* Plaintiffs have never disputed that Mayor Schell acted within the scope of his emergency powers under SMC 10.02 when he implemented the restricted zone. *Buck Decl., ¶ 3.* The Mayor's proclamation was accompanied by an emergency order that imposed a general curfew. *Menotti Dkt. #28.* Shortly thereafter, Governor Locke deployed the Washington National Guard.

---

[4] "Help the officer" is the highest priority assistance call an officer can make.

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 7

NO. C00-1672 MJP
3019-021525  65582

**STAFFORD FREY COOPER**
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900 FAX 206.624.6885

*Menotti Dkt. 33.* Until they filed their appellate brief, plaintiffs had never disputed the validity of the declaration of a state of emergency. *Buck Decl., ¶ 5.*

At approximately the same time as the declaration of the civil emergency, large crowds at 4th and Pike and 6th and Pike became even more violent. Protestors committed numerous acts of property damage, looting, and assaults on police officers. Officers were pelted with sticks, bottles, traffic cones, empty canisters, and other debris. Some protestors used chemical irritants on police, and a large fire was set in the intersection of 4th and Pike. *Menotti Dkt. #29, 31, 33.*

Niketown was also under siege by a large crowd that destroyed property and assaulted officers. Officers were forced to evacuate the Niketown employees through a back alley. *Menotti Dkt. #29, 33.* At 6th and Stewart, the crowd pulled a garbage truck driver from his vehicle and assaulted him. Officers were deployed to rescue the driver. *Menotti Dkt. #33.*

Later in the evening, officers faced extremely aggressive rioters at Summit and Howell. On at least three occasions, officers attempted to disengage from the crowd. *Menotti Dkt. #33.* Each time, the rioters reconstituted and followed the officers. They threw rocks, bottles, golf balls, and fired incendiary devices at the officers. Id. Confrontations continued from 11:30 p.m. to 3:30 a.m. Id. Notably, President Clinton arrived at the Westin Hotel around this time. Id.

**Wednesday, December 1, 1999**

In the early morning hours of Wednesday, December 1, 1999, Mayor Schell signed a third emergency order. *Menotti Dkt. #28.* This order established a restricted zone, which encompassed the Convention Center and most of the hotels in which delegates were lodging. Id. This included the Westin Hotel where President Clinton was staying. Only certain people were permitted to enter the restricted zone: (1) delegates and authorized WTO personnel, (2) owners and employees of businesses and other personnel necessary to operate those businesses, (3) residents, and (4) emergency and safety personnel. Id. City officials and representatives of the press were later added to the list of individuals permitted to enter the restricted zone. Id.

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 8

NO. C00-1672 MJP
3019-021525  65582

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

One of the primary purposes of the restricted zone was to provide delegates with safe access from their hotels to the various WTO venues. *Menotti Dkt. #33.*  This was especially important while the President was in the city.  *Id.*  He was escorted between several venues during the morning and early afternoon.  *Id.*  Contemporaneously, officers on the perimeter of the restricted zone continued to encounter highly mobile, aggressive, and hostile protestors. *Menotti Dkt. #29, #33.*  Protestors continued to cause property damage, throw debris, and block streets.  Vehicular traffic was at a virtual standstill.[5]  *Id.*  Police clashed with rioters throughout the remainder of the day and night. Numerous arrests were made after protesters ignored verbal warnings to disperse.  *Menotti Dkt. #33.* Shortly after 11:00 p.m., a crowd of 1000 – 1500 people descended on the East Precinct.  *Id.*  The siege on the East Precinct lasted until approximately 3:00 a.m. the next morning.  During that time, the crowd attempted to breach the police perimeter surrounding the precinct on several occasions. Officers were again assaulted with rocks and other projectiles.  *Id.*

Protest and damage problems continued throughout the end of the ministerial meetings.  The City lifted the restricted access zone at the end of the conference.

**B.    General procedural history.**

Following the WTO conference, the plaintiffs and others sued the City and its employees. *Buck Decl., ¶ 3.*  These lawsuits challenged the constitutionality of Order No. 3.  *Id.*  The City moved to consolidate these actions for the limited purpose of moving for partial summary judgment on shared questions of law.  *Id.*  The district court granted the motion to consolidate, and the City sought an order establishing that the restricted zone was a facially valid application of SMC 10.02 under the constitution as a matter of law.  *Menotti Dkt. #27.*

The consolidated claimants filed a collective opposition and cross-moved for summary judgment, asking the court to find that the City maintained a municipal policy of "excluding disfavored speakers from traditional public forums and giving officers unfettered discretion for arbitrary enforcement." *Menotti Dkt. #67.*  The district court granted the City's motion for

---

[5] There are several day care centers in the downtown core.  As a result of the protest activity, many parents were substantially delayed from picking up their children.

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR CLASS CERTIFICATION - 9

NO. C00-1672 MJP
3019-021525  65582

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

summary judgment as to the facial validity of Emergency Order No. 3, and denied the consolidated claimants' cross-motion. *Hickey Dkt. #55.*

Based in part on these rulings, the district court subsequently denied plaintiffs' (untimely) motion for class certification and dismissed plaintiffs' supervisory liability claims against then Mayor Paul Schell and then Chief of Police Norm Stamper. *Hickey Dkt. #84, 94.* Because the court upheld the Emergency Order that lead to most of the arrests relevant to this action, the parties had no reason to continue their discovery efforts on that front. *Buck Decl., ¶ 4.* Consequently, the class members and witnesses who submitted declarations in support of this third attempt to certify the class have not been deposed. *Id.*

After the summary judgment rulings, the plaintiffs asked the district court to enter final judgment against the plaintiffs, and the court complied. *Hickey Dkt. #111.* Plaintiffs filed an appeal on November 13, 2002. *Hickey Dkt. #113.*

The Ninth Circuit affirmed the district court's ruling as to the constitutionality of the emergency orders. <u>See</u> <u>generally</u> <u>Menotti</u>, 409 F.2d 113.[6]  However, while it affirmed the summary judgment rulings dismissing the claims against Paul Schell and Norm Stamper, it held that there was a genuine issue of material fact as whether plaintiffs Hankin, Hudziec, Lane, Cooper, and Pearson were arrested solely due to the content of their speech. <u>Id.</u> at 1149.

## C.   Facts specific to Hickey plaintiffs.

Plaintiffs filed suit against the defendants on October 2, 2000. <u>*See Hickey Dkt. #1.*</u>   At that time, all of the plaintiffs were representatives of a proposed class of individuals who were allegedly arrested for violating the emergency proclamations and/or other municipal and state laws. *Id.*  In the instant motion, plaintiffs withdraw Ms. Pearson as a class representative. *Third Mot., p. 1 n. 1.*  Further, the court should note that the court has dismissed the claims brought by plaintiffs Robert Hickey and Carroll Jackson. *Hickey Dkt. #248.*

In their original and amended complaints, the plaintiffs define the class as follows:

---

[6] Plaintiffs Robert Hickey, Emily Malony, and Carroll Jackson did not appeal. <u>Menotti</u>, 409 F.3d at 1118 n. 1.

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 10

No. C00-1672 MJP
3019-021525  65582

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

> All persons who were arrested by the City of Seattle and its police agents or its affiliated police agents on December 1, and 2, 1999, pursuant to the defendants' "no protest" policies and directives which were eventually embodied by the City of Seattle's Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) and who were subsequently not convicted of any crime. Included in this class are all persons arrested pursuant to such policies both inside and outside the zone established by Order Number 3.

Several months after the extended deadline expired, plaintiffs untimely filed their first motion for certification. *Hickey Dkt. #25.* The court properly denied that motion on its merits, noting that plaintiffs could not establish commonality under Rule 23. *Hickey Dkt. # 80.* Several months later, plaintiffs moved to certify yet another class, composed of certain individuals arrested outside the restricted zone. *Hickey Dkt. #96.* The court has since dismissed the claims brought by those two individuals and the class they purported to represent. *Hickey Dkt. #248.*

After the Ninth Circuit remanded the single issue of whether the specific plaintiffs were arrested solely due to speech content, plaintiffs filed a third motion for class certification, which changes the proposed class definition and proposes a class not pled or previously contemplated:

> All individuals arrested on the morning of December 1, 1999 in Seattle, Washington, in Westlake Park or the streets or sidewalks immediately adjacent to Westlake Park.

*Third Mot., p. 8.*

Plaintiffs concede that they and the putative class members were present in Westlake Park in violation of Order No. 3, which order the district court and the Ninth Circuit held constitutional. *Third Mot., p. 2.* They also concede that the individuals allegedly arrested arrived under circumstances that vary among the class representatives as well as the putative class members. *Id.* Due to this case's procedural history , through no fault of the defendants, none of the putative class representatives have been deposed and virtually no discovery into the facts and circumstances of their arrests has been conducted. *See Buck Decl., ¶ 4.*

Since the "as applied" issue was remanded, the court has not entered a scheduling order establishing any deadlines for the remainder of this action. The parties agreed to a proposed scheduling order which would allow additional time for discovery of evidence relevant to the

---

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 11

NO. C00-1672 MJP
3019-021525   65582

**STAFFORD FREY COOPER**

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

plaintiffs' claims.  *See Hickey Dkt. # 259.*  The City now needs a portion of this allocated time to ascertain the true status of plaintiffs' claims and circumstances and validity and viability of those claims.  *Buck Decl., ¶ 4.*  Absent this discovery, it is impossible for the defendant to adequately defend this certification request.  *Id.*  As such, the City's attorney contacted the plaintiffs' attorney to obtain a brief continuance of this motion so that the City could depose the plaintiffs and witnesses on a limited subject matter.  *Buck Decl. re Mot. to Continue Class Certification Mot. Hearing Date, ¶ 4.*  Plaintiffs refused.  *Id.*

### III.  LEGAL AUTHORITY AND ANALYSIS

Litigation is generally conducted by and on behalf of the individual parties only. General Tel. Co. v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).  Class actions may be an exception, but only under limited circumstances. Id.  A court shall not certify a class unless the proponent makes a prima facie showing of each of the certification prerequisites and demonstrates that appropriate grounds for a class action exist. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975).  Should the proponent fail to carry this burden as to any one of the requirements, the court should deny class certification.  Rutledge v. Electric Hose & Rubber Co., 511 F.2d 668, 673 (9th Cir. 1975).

Plaintiffs cannot establish that their case warrants making the limited exception to the general rule of individualized litigation.  The named plaintiffs do not have standing, the class definition is exceeds the scope of remand as defined in Menotti, and the plaintiffs cannot establish Rule 23's prerequisites. Moreover, class litigation, at this juncture, is simply not appropriate and would not further the policies of class litigation.

**A.     The named plaintiffs do not have and cannot establish standing.**

Standing is an absolute prerequisite to relief, "an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1991); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998).  A plaintiff who cannot establish standing may not invoke the jurisdiction of the federal courts.  Bernhardt v.

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

County of Los Angeles, 279 F.3d 862 , 868 (9th Cir. 2003) (court had "the power and the duty" to dismiss the claims if plaintiff lacked standing); U.S. Const., Art. III.  Because these "are not mere pleading requirements but rather an indispensable part of a plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  Lujan at 561 (emphasis added).

To establish standing, a person must show, first and foremost, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent."  Lujan, 504 U.S. at 560.  Because the named plaintiffs cannot establish standing, they cannot seek the relief on behalf of themselves or any other member of the class they represent.  O'Shea v. Littleton, 414 U.S. 488, 494 (1974); Rizzo v. Goode, 423 U.S. 362, 372 (1976).

Plaintiffs repeatedly admitted their claims fail if Order No. 3 is facially constitutional:

> [P]laintiffs claimed that if the City's No Protest Zone policy was unconstitutional, then their arrests were illegal.  Their arrests may also have been illegal for other reasons, but plaintiffs have not (with one exception) sought relief based on grounds unrelated to the constitutionality of the No Protest Zone policies.[7]  If the Court has ruled that the No Protest Zone was constitutional, then so were plaintiffs' arrests, which were made pursuant to that policy.

> …the City also appears to believe that plaintiffs' have other "individualized arrest-related" claims that were not addressed by the Court's prior rulings. Again, except for the plaintiffs who were arrested outside the No Protest Zone, plaintiffs have not asserted other "individual arrest-related claims" in this action – their claims are based on their allegations that they were arrested for protesting in violation of the No Protest Zone policy.

*Hickey Dkt. # 75, pp. 2-3 (footnote in the original, but excerpted)*.  When asked to identify with particularity what City policy resulted in their injuries, plaintiffs uniformly stated, "The City's No Protest Zone policies, created by Emergency Order No. 3."  *Buck Decl., Exs. 1-5, Interrog. No. 17*.  Their complaint states: "This suit is brought as a class action on behalf of all individuals

---

[7] "The one exception is plaintiffs who were arrested outside the No Protest Zone…"

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 13

No. C00-1672 MJP
3019-021525  65582

**STAFFORD FREY COOPER**

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

wrongfully arrested pursuant to the City's extensive "no protest" policies – policies which were ultimately embodied in Order Number 3." *Hickey Dkt. # 24, ¶ 9.*

The Ninth Circuit in <u>Menotti</u> determined that Order No. 3 was a lawful time, place, and manner restriction on speech that "prohibited protest <u>on any topic</u> with the restricted zone." <u>Id.</u>, 409 F.3d at 1144, 1145 (emphasis in the original).   Accordingly, plaintiffs' claims, by plaintiffs' own assertion and admission, fail.  Consequently, the claims of the named plaintiffs do not and cannot constitute a "legally protected interest."

Notably, the claims do not survive even under the "as applied" remand.  The <u>Menotti</u> court remanded only the very limited issue of whether Order No. 3 was constitutional applied, subject to very specific guidelines and limitations that plaintiffs do not address: (1) all persons who did not enter or who were excluded from the restricted zone because of that order <u>cannot</u> assert a valid claim individually or as a class member; (2) to establish a valid "as applied" challenge, the parties have to establish that (a) they were excluded "solely because of the content of their visible communications without regard to the exemptions within Order No. 3, or (b) they were allowed to enter the restricted zone only after removing visible communications hostile to the WTO; and (3) the viability of a claim against the City depends on the factual determination of whether their claim is based on a policy of the City of Seattle. <u>Id.</u>, 409 F.3d at 1148 n. 67.

Plaintiffs do not contend that they or the putative class members were required to remove communications due to content before entering the restricted zone. *See* Third Mot.; *Hickey Dkt. #24.*  Rather, they admit the converse, that they were in Westlake Park either wearing or in the vicinity of others wearing anti-WTO communications. *See declarations supporting Third Mot.* Moreover, they do not claim that they were arrested for failing to remove the communications, nor do they claim they were arrested based solely on the content of their speech. *See id.*  Rather, they admit they were arrested for protesting in general, thereby violating the legal and constitutional Order No. 3. *See* <u>id.</u>; *see Weaver Decl., Ex. H, ¶¶ 12-13 (noting the only people arrested were protestors).* <u>See also</u> <u>Menotti</u>, 409 F.3d at 1144, 1145.  Because plaintiffs have

not established that they fall within the <u>Menotti</u> court's directives for continued action, they have not and cannot establish a "legally protected interest."

Also noteworthy, plaintiffs have not set forth any evidence of any unlawful policy, which the <u>Menotti</u> court noted was necessary under the circumstances of the complaint.  <u>See</u> <u>Menotti</u>, 409 F.2d at 1148 n. 67. There are three ways to show the requisite policy: (1) by showing "a longstanding practice or custom which constitutes the standard operating procedure," (2) by showing that the decision-making officer was an authorized policy-maker, and (3) by showing that the decision-making officer's decision was ratified or that he was delegated the authority to make such policy. <u>Id.</u> at 1147.

The court has already properly dismissed plaintiffs' claims alleging ratification and delegation. <u>Menotti</u>, 409 F.2d at 1149.  Plaintiffs do not claim and have not presented any evidence to show that the scene commander present at Westlake Park was an authorized policy-maker. *See Third Mot.; Hickey Dkt. #24.*  Moreover, they have not claimed or shown that the City has a "long standing practice and custom" of arresting individuals based upon the content of their speech. *Id.*  At most, plaintiffs allege that a "no protest" policy arose after the initial days of the WTO riots. *Hickey Dkt. # 24, ¶ 3.* An alleged policy in existence for 1 day, which has already been deemed to constitutionally further a legitimate state interest, <u>see</u> <u>Menotti</u> at 1137, simply cannot establish the requisite wrongful policy.  Plaintiffs do not have standing; certification of the class is improper.  <u>O'Shea</u>, 414 U.S. at 494; <u>Rizzo</u>, 423 U.S. at 372.

**B.      Plaintiffs do not allege a clearly defined and ascertainable class.**

An essential prerequisite of a class action is that there must be a "class."   7A Wright & Miller, *Federal Practice and Procedure* § 1760, at p. 115 (2d ed. 1986).  "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." <u>DeBremaecker v. Short</u>, 433 F.2d 733, 734 (5th Cir. 1970); <u>see</u> <u>also</u> <u>Mateo v. The M/S Kiso</u>, 805 F. Supp. 761, 793 (N.D. Cal. 1991).  The class description must be sufficiently definite so that it is administratively feasible to determine whether a particular

**STAFFORD FREY COOPER**

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

individual is a class member.  7A Wright & Miller, *Federal Practice and Procedure* § 1760, at p. 121.  The definition cannot be based on statements requiring individual adjudications.  <u>Crosby v. Social Sec. Admin.</u>, 796 F.2d 576, 579-80 (1st Cir. 1986).  Moreover, it cannot be too broad, <u>O'Conner v. Boeing N. Am., Inc.</u>, 180 F.R.D. 359, 367 (D.C. Cal. 1997), or too amorphous. <u>Vietnam Veterans Against the War v. Benecke</u>, 63 F.R.D. 675, 680 (D.C. Mo. 1974).

Plaintiffs' proposed definition is deficient for several reasons.  First, it is decidedly overbroad.  The proposed definition includes anyone "arrested" – even if that person was properly arrested and subsequently convicted.  It makes no attempt to exclude individuals whose unlawful acts were egregious and whose arrests were allegedly lawful. Further, the definition requires the court to disregard the Ninth Circuit's ruling that the Order No. 3, which Plaintiffs concede they were violating at the time of their respective arrests, was lawful.  Plaintiffs seek to certify a class that constitutes all persons "arrested" <u>for any reason whatsoever, including violation of Order No. 3, irrespective of whether the arrest was lawful</u>. The proposed definition allows individuals who were indisputably lawfully arrested – individuals who were not injured and do not have standing to sue -- to maintain this action.  <u>See</u> Lujan, 504 U.S. at 560 (the irreducible constitutional minimum of standing" requires plaintiff to suffer an "injury in fact").

The definition is also overbroad in that it exceeds the scope of the remand.  <u>See</u> <u>supra</u> at part III.A.

The proposed definition also allows individuals with nothing in common to the allegations of the Amended Complaint to be class members.  Because one need only be arrested, persons arrested for activity totally unrelated to the subject matter of this suit, such as murder, drug dealing, or prostitution, would be class members.

In addition, the definition is deficient because several of its essential terms are undefined and vague.  The term "arrested" can constitute anything from causing the cessation of movement to handcuffing an individual to sending him or her to jail.  *Black's Law Dictionary (West Publ'g Co. 1990) (defining arrest as "depriving a person of his liberty" under "actual or assumed*

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

*authority"*).  By using the unqualified term "arrested," the proposed definition does not define whether the class is to include only those subjected to a custodial arrest, or anyone stopped and/or otherwise contained somewhere near Westlake Park.

The term "morning" is vague <u>and</u> gives rise to a challenge for overbreadth.  "Morning" could include any time between 12:01 a.m. to 11:59 a.m.  In addition, the term "streets or sidewalks immediately adjacent to Westlake Park" is also impermissibly vague and overbroad.  The term "adjacent" means "near or close to," "neighboring," "not widely separated though they may not actually touch."  *Black's Law Dictionary.*  Plaintiffs have had six years to identify the names of the streets and sidewalks they are attempting to include in their geographic description.  Instead, they use a term that conceivably encompasses a far greater region than where the mass arrest occurred.

In addition, the proposed definition does not attempt to exclude individuals who have already fully and finally litigated claims against the named defendants, thereby potentially permitting double recovery.  Nor does the definition require that the arrested individual be arrested by one of the defendants in this action.  Thus, individuals "arrested" by the National Guard or the Washington State Patrol or even the FBI could be included in this action against the City of Seattle, Paul Schell, and Norm Stamper.[8]

Furthermore, the proposed definition improperly requires this court to conduct individual adjudications to ascertain class membership.  <u>See</u> <u>Davoll v. Webb</u>, 194 F.3d 1116, 1146 (10th Cir. 1999) (upholding trial court's refusal to certify a class because the class definition required the court to first individually adjudicate whether each potential class member fit within the definition); <u>Luedke v. Pan Am Corp.</u>, 155 B.R. 327, 330 (2d Cir. 1993).  Because the class definition does not require a putative member to have suffered an as yet uncompensated injury, the court would have to determine whether each proposed member had standing to sue and whether that individual had already recovered for his or her claim.

---

[8] This court has already held that the City of Seattle did not have a policy, practice, or custom of effectuating unlawful arrests or stifling speech when the court granted the defendants' motion for summary judgment on the failure to train or supervise claim.  <u>See</u> *Menotti Dkt. #102.*  Thus, the plaintiffs will have to somehow establish municipal liability for these arrests on some other grounds.  <u>Larez v. Los Angeles</u>, 946 F.2d 630, 645 (9th Cir. 1991).

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 17

NO. C00-1672 MJP
3019-021525  65582

**STAFFORD FREY COOPER**

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

1

2

3

4

5

6

7

The court would also have to determine whether a putative class member was "arrested." "Whether an arrest has occurred depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop." United States v. Patterson, 648 F.2d 625, 632 (9th Cir. 1981). Determining whether an individual was "arrested" in general requires the court to engage in a fact-specific inquiry as to each putative class member; in addition, given the Menotti ruling, the court simply cannot avoid such determinations. Because plaintiffs' proposed definition is fatally deficient, the court should deny plaintiffs' motion for class certification.

8

**C.    Plaintiffs have not and cannot satisfy any of the four prerequisites of Rule 23(a).**

9

10

11

Even if plaintiffs had alleged a clearly ascertainable class, they are still unable to satisfy any of the prerequisites set forth in Rule 23(a).   The failure to meet any one of these requirements defeats certification.  FED. R. CIV. P. 23(a); 7A Wright & Miller, *Federal Practice and Procedure* § 1759, at p. 97.

12

**1.    Plaintiffs failed to establish numerosity.**

13

14

15

16

17

To satisfy Rule 23(a)(1), plaintiffs must prove that the proposed class is "so numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1).  Impracticable means "extremely inconvenient or difficult to join members of the class."  Roman v. Korson, 152 F.R.D. 101, 105 (W.D. Mich. 1993).  Conclusory allegations of impracticability are insufficient to prove numerosity. Mortimore v. FDIC, 197 F.R.D. 432, 435 (W.D. Wash. 2000).

18

19

20

21

22

23

Plaintiffs claim that class size approximates 200, relying in part upon an unauthenticated video of select news footage.  That video should be stricken.  FED. R. EVID. 803, 901.  Plaintiffs admit that only 128 arrests are actually documented.  *Third Mot., ¶ 6.* In any case, "[n]umbers alone are not determinative of [numerosity], which turns on the impracticability of joinder." Hum v. Dericks, 162 F.R.D. 628, 634 (D. Haw. 1995) (refusing to find numerosity where putative class consisted of over 200 members). Courts have denied certification of classes with over three hundred members. See, e.g., Minersville Coal Co. v. Anthracite Export Ass'n, 55 F.R.D. 426

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

(M.D. Pa. 1971) (refusing to find numerosity with 330 putative class members); Utah v. American Pipe & Constr. Co., 49 F.R.D. 17 (C. D. Cal., 1969) (refusing to find numerosity with 350 putative class members); 1 Herbert B. Newberg, Newberg on Class Actions § 3.03, at 136-37 (2d ed. 1985).  Where class members may be easily identified, joinder is not impracticable. Garcia v. Gloor, 618 F.2d 264, 267 (5th Cir. 1980).

Plaintiffs have already identified the putative class members, *Third Mot.*, *pp. 6-7,* but make no effort to establish that joining these already-identified individuals is impracticable. Blackie, 524 F.2d at 901; Rutledge, 511 F.2d at 673; Hum, 162 F.R.D. at 634.  Moreover, they make no showing that these individuals qualify for class membership under the Menotti ruling.

### 2.    Questions of law and fact are not common to the class.

Plaintiffs wrongly imply that all civil rights actions involving more than one plaintiff are proper class actions.  Rule 23(a)(2) requires that "questions of law or fact common to the class" be present in order to maintain a class action.  Id.  To justify class treatment, relief must "turn on questions of law applicable in the same manner" to each class member.  General Tel., 457 U.S. at 155; In re American Med. Sys., Inc., 75 F.3d, 1069, 1079 (6th Cir. 1996).  The commonality requirement is not met where each class member's claims necessitate individual determinations of liability.  Kerr v. City of West Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989).

Plaintiffs cannot satisfy the requirements Rule 23(a)(2). The Ninth Circuit made clear that the sole issue to be considered is whether the order was constitutional as applied with respect to three very specific inquiries.  Menotti, 409 F.3d at 1148 n. 67. As applied analysis, by its very nature, requires the court to consider the specific facts and circumstances surrounding each individual arrest – especially under the Menotti ruling.

Further, plaintiffs concede that there are a variety of individualized circumstances that existed: (1) the manner in which the individuals arrived at Westlake; (2) the reason why the individuals were there; (3) some were lawfully present, others were not; (4) some were in the park itself, some in the sidewalks and streets; (5) some were allowed to leave, others were

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

allegedly "trapped;" (6) some heard the orders to disperse, others did not; (7) some were allegedly "forced to sit for hours on a bus," or others were not; (8) some were allegedly "detained for several days," others were not; (9) the crime or misdemeanor with which they were charged varied;[9] and (10) some arrest records describe the basis for the arrest, others did not. The diversity of factual circumstances precludes a finding of commonality.

### 3.    Plaintiffs' claims are not typical of the class members' claims.

> The . . . typicality requirements of Rule 23(a) . . . serve as guide posts for determining whether under the particular circumstances the maintenance of a class action is economical and whether the named plaintiffs' claim and the class claims are <u>so interrelated</u> that the interests of the class members will be fairly and adequately protected in their absence.

<u>General Tel.</u>, 457 U.S. at 157 n. 13 (emphasis added).  A plaintiff's claim is "typical" if (1) it arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and (2) is based on the same legal theory.  <u>Morgan v. Laborers Pension Trust Fund</u>, 81 F.R.D. 669, 677 (N.D. Cal. 1979).

Here, the particular circumstances are not interrelated and preclude the maintenance of an economical class action.  Even the representative plaintiffs do not claim circumstances "typical" to each other.  By their own admission, their arrests occurred under different circumstances with different results.  <u>See</u> <u>supra</u> part III.C.2.  The distinct circumstances of each arrest and events leading up to that arrest require the application of different legal theories and individual-specific litigation.  Recognizing the many possible circumstances under which the unidentified class members could have interacted with officers, plaintiffs' proposed class cannot satisfy the typicality requirement of Rule 23(a)(3).

### 4.    Plaintiffs cannot fairly and adequately protect the interests of the class.

To fairly and adequately protect the interests of the class (1) the representative must appear able to prosecute the action vigorously through qualified counsel, and (2) the

---

[9] Plaintiffs admit not all arrestees were charged with the same crime, noting instead that some were charged with failure to disperse, others with pedestrian interference, possession of a gas mask, obstruction, curfew violations, or aggressive begging.  <u>See</u> <i>Third Mot.</i>

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

representative must not have interests antagonistic to or conflicting with the interests of the unnamed members of the class.  <u>Lerwill v. Inflight Motion Pictures, Inc.</u>, 582 F.2d 507, 512 (9th Cir. 1978).  Plaintiffs failed to establish this requirement.  While plaintiffs' counsel may in fact have such capacity, it is Plaintiffs' responsibility to demonstrate as much and they have not.

**D.    Plaintiffs failed to satisfy Rule 23(b)(3).**

Plaintiffs claim certification is proper only under Rule 23(b)(3).  A plaintiff cannot maintain a class action under Rule 23(b)(3) when (1) questions affecting only individual members of the putative class predominate, and (2) a class action is not superior to other available methods for the fair, efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). These requirements are known as "predominance" and "superiority."  <u>See</u> <u>In re</u> <u>Dalkon Shield</u>, 693 F.2d 847, 856 (9th Cir. 1982).  The court may consider: (A) the interest of the class members in controlling the prosecution of separation actions; (B) the extent and nature of any litigation concerning the controversy already commenced by putative class members; (C) the desirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties to be encountered in managing the class action.  FED. R. CIV. P. 23(b)(3)(A) - (D).  Rule 23(b)(3) certification is not appropriate if the actual interests of the parties cannot be served best in a single action.  <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation omitted). Because individual issues predominate and a class action is inferior to other methods of adjudication, the class cannot be certified under subsection (b)(3).

**1.    <u>The individual issues predominate over common issues.</u>**

The predominance requirement tests whether the proposed class members are sufficiently cohesive to warrant adjudication by representation.  <u>Hanlon</u>, 150 F.3d at 1022.  Although similar to the commonality requirement, the predominance requirement is "far more demanding."  <u>Id.</u> Mere commonality of factual or legal questions is not enough; rather the court must focus on the relationship between the common and individual issues.  <u>Id.</u>  Common questions of fact and/or law predominate when they constitute a significant aspect of the case and can be resolved for all

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 21

NO. C00-1672 MJP
3019-021525  65582

**STAFFORD FREY COOPER**
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

members in a single adjudication. Id.  To satisfy the predominance test, the class action must

help achieve judicial economy. See General Tel., 457 U.S. at 155.

When determining whether individual issues predominate, a court may consider the class

definition.  See Mateo, 805 F. Supp. at 773.  Additionally, it may consider the course of conduct

from which the claims arise.  Id. at 774.  Individual issues predominate when (1) no single

happening or event occurs to cause the harm, (2) no one set of operative facts establishes

liability, or (3) no single proximate cause allies equally to each potential class member.  Dalkon

Shield, 693 F.2d at 853.

In this case, individual issues predominate over common issues.  The ruling in Menotti

and the class definition require the court to decide a plethora of individual issues just to

determine whether an individual fits within the class definition.  See supra part III.A and B.

Even if the class members share a common issue, to determine whether each class member is

entitled to relief, the court will have to independently adjudicate the merits of his or her arrest in

light of the other possible bases therefore.  See supra parts III.A and C.2.

The purported class members were not injured under a collective nucleus of facts.  See

Dalkon Shield, 693 F.2d at 856 (even if the case does arise under a common nucleus of facts,

individual issues may predominate).  The list of varying conditions upon which each of the 128

"arrests" may have arisen is endless and includes: (1) whether the individuals were arrested

solely because of the content of their speech; (2) whether the individuals were not permitted to

enter Westlake without removing content-specific paraphernalia; (3) the claimant's location prior

to arrest, not just the site of arrest (i.e., had the individual been ordered to disperse while

improperly marching into the Restricted Access Zone, was the individual blocking the

causeways or had that individual been present in the restricted access zone before proceeding

north to the site of arrest); (4) the claimant's status (i.e., was the individual an aggressor or

nonaggressor; had the individual been ordered to disperse; was the individual lawfully present);

(5) the bases for the arrests; and (6) the officer's reasonable beliefs regarding each putative class

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION

601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

member.    The number of possible circumstances ultimately resulting in arrest grows exponentially.  Plaintiffs simply cannot establish that a single happening or event caused the harm, one set of operative facts establishes liability, and a single proximate cause allies equally to each potential class member.  Plaintiffs cannot establish that common issues prevail.

### 2.    A class action is not the superior method of adjudication here.

A class action here is not superior to other available methods of adjudication.   In determining "superiority," the court should consider efficiency and the accessibility of class members.   Dalkon Shield, 693 F.2d at 856 (efficiency); Mateo, 805 F. Supp. at 774 (accessibility).

The particularized need for individualized inquiries as to each class member and each claim makes a class action extremely inefficient.  See supra parts III.A, B, C.2, and D.1.a.  It would be far simpler in this case to allow the action to proceed, define the issues, and possibly define the class, if proven justified, at a later date.  Such an action would obviate the need for class notification and other complications associated with class litigation.

Furthermore, plaintiffs have failed to show that the class members are accessible, much less amenable to this suit.  That only a few of the 128 putative class members have bothered making claims six years into this suit shows a distinct lack of interest on the class' behalf. Putative class members would have already filed suit or joined in other previously-filed WTO-related class actions had they intended to litigate any such claims.   In addition, as these individuals may have come from all over the world, plaintiffs will have considerable difficulty in accessing these putative class members and communicating with them for the purposes of discovery.  A class action is not the superior action.  Mateo, 805 F. Supp. at 774.

### E.    The court cannot determine the propriety of class certification without discovery.

Plaintiffs claim that 200 individuals were present at Westlake on December 1, 1999, but concede that the facts and circumstances of these individuals' presence vary significantly.  *Third Mot., p. 1; see supra.*  Not even the named plaintiffs are alleging the same facts or circumstances.

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

*Id.* Only the plaintiffs possess the information necessary to determine the existence of a class or subclasses; the plaintiffs rely almost exclusively on the plaintiffs' and their witnesses' declarations to support their motion – declarations of individuals who have not yet been deposed, who were not previously named plaintiffs, and who have not yet answered discovery requests.

Well-established law requires this court to allow defendants to conduct minimal discovery so that the court can truly make a reasoned and well-determined judgment as to whether certification will further the principles of class certification. *See Defs.' Mot. to Continue Class Certification Hearing Date, filed January 26, 2005, and the authority cited therein, which defendants wholly incorporate into this motion.* Without such an opportunity, the defendants are deprived of any real ability to defend against the class certification. *Id.* Without a developed record that is not wholly one-sided, the court cannot make the necessary "reasonable determination" regarding the propriety of certification. *Id.* The court should deny the motion, or at least defer ruling upon it until after the needed, minimal discovery has been conducted.

## IV.    CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing, defendants respectfully request that this court deny plaintiffs' motion for class certification.

DATED this 30th day of January, 2006.

STAFFORD FREY COOPER

By:    /s/ Ted Buck via ECF
          Ted Buck, WSBA #22029
          Heather L. Carr, WSBA #29780
          Karen L. Cobb, WSBA #34958
Attorneys for Defendant

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

<u>Certificate of Service</u>

I certify that on the date noted below I electronically filed this document entitled DEFENDANTS' OPPOSITION TO PLAINTIFFS' THIRD MOTION FOR CLASS CERTIFICATION with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Tyler Weaver
(tyler@hagens-berman.com)
*Lead Counsel for Plaintiffs*

Steve Berman
(steve@hagens-berman.com)
*Counsel for Plaintiffs*

Michael S. McNamara
(mikem@stanislaw-ashbaugh.com)
*Counsel for Plaintiffs*

Arthur H. Bryant
(abryant@tlpj.org)
*Counsel for Plaintiffs*

Victoria Ni
(vni@tlpj.org)
*Counsel for Plaintiffs*

Fred Diamondstone
(fdiamondstone@seanet.com)
*Counsel for Plaintiffs*

Benjamin Schwartzman
(ben@lshblaw.com)
*Counsel for Plaintiffs*

John R. Muenster
jmkk1613@aol.com
Co-Counsel for Plaintiffs

Michael E. Withey
mike@skwwc.com
*Counsel for Plaintiffs*

and I certify that I have caused to be served in the manner noted below a copy of the above-listed document to the following non CM/ECF participants:

[ ]    Via Facsimile
[ ]    Via First Class Mail
[ ]    Via Messenger

DATED this 30th day of January, 2006, at Seattle, Washington.

/s/Heather Carr via ECF
Heather Carr, WSBA #29780

DEFENDANTS' OPPOSITION TO THIRD MOTION FOR
CLASS CERTIFICATION - 25

No. C00-1672 MJP
3019-021525  65582

**STAFFORD FREY COOPER**
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885