UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT HICKEY, et al.,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>THE CITY OF SEATTLE, et al.,<br><br>　　　　　　Defendants. | No. C00-1672MJP<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

　　　　This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 328) and Defendant's Motion for Summary Judgment Dismissal. (Dkt. No. 332).  Having reviewed the parties' briefs, and the documents submitted in support thereof, and having heard oral argument on the issues, the Court GRANTS Plaintiffs' motion for summary judgment on the issue of probable cause and DENIES Defendants' motion for summary judgment dismissal.  The Court also DENIES Defendant's motion to strike.

**BACKGROUND FACTS**

　　　　This matter arises from arrests made on the morning of December 1, 1999, during anti-World Trade Organization (WTO) protests in Seattle, Washington.[1]  At the time of the arrests, much of downtown Seattle, including Westlake Park, had just been declared off-limits to individuals who did not meet certain exceptions.  In the early morning hours of December 1, 1999, then-Mayor Paul

---

[1] Many of the facts surrounding the ministerial conference of the WTO in Seattle, the protests during the week of the conference, and various police actions during those protests have been outlined by the Court in previous Orders. (See Dkt. No. 184, 303).

ORDER - 1

Schell issued Emergency Order No. 3, which imposed a limited curfew in downtown Seattle. Order No. 3 stated, in relevant part:

> A limited curfew is imposed in the portion of the City within the following boundaries: Starting on the corner of 4th Avenue and Lenora Street, then proceeding south on 4th Avenue to Seneca Street, then east on Seneca Street to the I-5 freeway, then north along the I-5 freeway to Boren Avenue, then north on Boren Avenue to Pine Street, then west on Pine Street to 6th Avenue, then north on 6th Avenue to Lenora Street, then west on Lenora Street to, and concluding at, 4th Avenue and Lenora . . . .
>
> Commencing immediately on December 1, 1999, no person shall enter or remain in a public place as defined in SMC 15.02.046C within the above described limited curfew area except the following:
>
> Delegates and personnel authorized by the WTO to participate in official WTO functions;
>
> Employees and owners of businesses within the limited curfew area and other personnel necessary to the operation of those businesses;
>
> Persons who reside within the limited curfew area;
>
> Representative of the press with proper credentials;
>
> City officials with valid identification;
>
> Emergency and public safety personnel.

(Cobb Decl. at 2, Exh. C). The City interpreted "other personnel necessary to the operation of those businesses" broadly to include shoppers. (Weaver Decl., Exh. W (Schell Decl.)).

A few hours after the mayor issued Order No. 3, police arrested approximately 200 people in Westlake Park. Some of the facts surrounding the arrests are in dispute. Plaintiffs assert that the 200 or so individuals arrested in Westlake Park had arrived under varying circumstances. Plaintiffs provided evidence that some people arrived in Westlake Park after marching from Denny Park (Weaver Decl., Exh. D (Cooper Decl.)), that some joined the march in downtown Seattle (Weaver Decl., Exh. G (Haim Decl.)), that some walked to Westlake Park without being part of any march (Weaver Decl., Exh. I (Worden Decl.)), and that at least one was a credentialed member of the media who was documenting the arrest when police forced her to join the other arrestees. (Weaver Decl., Exh. J (Schuerholz Decl.) at 49:18 - 53:12 and 62:17 - 64:18). But the City argues, and has presented evidence suggesting, that all of the individuals arrested arrived in Westlake Park as a group

ORDER - 2

after marching from a different area of downtown Seattle. (Def. Resp. to Plaintiff's Motion at 4; Pugel Decl. ¶ 5-7). It is therefore unclear how all of the individuals eventually arrested in Westlake Park arrived there.

Many of the individuals arrested sat after entering Westlake Park. But it is unclear whether the arrestees sat before or after police surrounded them in Westlake Park. Then-Captain James Pugel stated in his declaration that "[m]any in the crowd . . . worked their way to Westlake Park, where they sat down. . . . I ordered officers to surround those protestors that would not leave and they were eventually arrested." (Pugel Decl. ¶ 7). Moreover, Lieutenant Dan Whelan's incident report states that "as the crowd entered the park they started telling one another to sit down." (Weaver Decl., Exh. C). But that evidence conflicts with the City's own briefing, in which the City states that "the class sat down - many with arms linked - after police surrounded them" (Def. Resp. at 2) as well as the declarations of individuals arrested who state that they sat after police surrounded them. (See Weaver Decl., Exhs. D ¶ 7, E ¶ 7, F ¶ 12, G ¶ 8, H ¶ 11, I ¶ 7).

Finally, there is conflicting evidence about whether an order to disperse was ever given to the group of individuals marching towards Westlake Park.[2] Captain Pugel stated in his declaration that orders to disperse were given to a group of people as they approached Westlake Park. (Pugel Decl. ¶ 6). But the individuals arrested who were a part of the march headed towards Westlake Park stated that they never heard any order to disperse before reaching the park. (Weaver Decl., Exhs. D ¶ 4, E ¶ 4, F ¶ 14).

Nevertheless, the following important material facts are not in dispute. Officers surrounded a large group of individuals in Westlake Park in the morning of December 1, 1999. The officers arrested every individual within the police perimeter without identifying whether they fell within any of the exceptions in Order No. 3. No order to disperse was given to the individuals in Westlake Park before police arrested them. No photographs were taken of the arrestees as they were arrested.

---

[2] The City conceded at oral argument that no dispersal order was ever given to individuals in Westlake Park.

ORDER - 3

After the individuals were arrested, they were placed on buses and driven to Sandpoint Naval Station, where some remained for up to three days.

Moreover, Plaintiffs have identified 147 arrest records that indicate the person was arrested at Westlake Park on the morning of December 1, 1999.[3] All 147 arrest records contain either no description of the basis for arrest or contain an identical, photocopied description of the arrest that states:

> LT. WHELAN GAVE ORDERS TO DISBURSE [sic] FROM WESTLAKE PARK.
>
> ALL REFUSED TO LEAVE AND WERE BLOCKING THE SIDEWALKS.
>
> NO PHOTO TAKEN IN FIELD DUE TO NUMBER OF ARRESTEES
>
> REFUSED TO GET OFF TRANSPORT BUS AT SANDPOINT PRISONER PROCESSING STATION

(Weaver Decl., Exh. P, Q-T). It is undisputed that these photocopied arrest records are false because, among other things, Lt. Whelan never gave an order to disperse from Westlake Park. (Weaver Decl., Exh. A (Whelan Dep.)). Plaintiffs also assert, and the City does not dispute, that all of the individuals with Westlake Park arrest records were charged with Pedestrian Interference and Obstructing a Public Officer. A few of the class members were also charged with Failure to Disperse. One person was additionally charged with a Curfew Violation. (Weaver Decl., Exh. P).

## PROCEDURAL HISTORY

As the Court explained in the Order Granting Plaintiffs' Motion for Class Certification, the procedural history of this case is quite convoluted. (See Dkt. No. 303). This case was originally filed before Judge Rothstein in this Court on October 2, 2000. This action was filed on behalf of a broad group of people arrested during the enforcement of Order No. 3 on December 1, 1999. Early in the case, Plaintiffs filed a first motion for class certification for a comprehensive class involving all people arrested in the downtown area on that day. This motion for class certification became moot and was

---

[3] The City does not dispute this fact.

ORDER - 4

denied after a series of summary judgment rulings by Judge Rothstein. The Ninth Circuit denied an interlocutory appeal.

In the meantime, the Plaintiffs sought to certify a second class before Judge Rothstein. This second class included people allegedly "herded" by police into an area around First Avenue and Broad Street, which was outside of the restricted zone, and arrested. Plaintiffs Hickey and Jackson were the named Plaintiffs for this second class. The Order certifying the second class also entered final judgment in the cases of five of the original named Plaintiffs (Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Denise Cooper, and Nicole Pearson), whose entire claims became moot in light of Judge Rothstein's summary judgment rulings. These five Plaintiffs joined the appeal in the related Menotti v. City of Seattle case (C00-372BJR), which was then before the Ninth Circuit.

On August 19, 2003, the Hickey case was transferred to Judge Pechman. (Dkt. No. 135). On December 29, 2003, the Court issued an Order regarding the parties' cross motions for summary judgment as to the second class. (Dkt. No. 184). In this Order, Judge Pechman granted in part and denied in part the parties' motions, finding issues of fact for trial regarding ratification of the police officers' actions by people with final policymaking authority and liability and concluding that the City had not met its burden of showing that individualized probable cause existed to arrest the class. On July 15, 2004, Judge Pechman approved a final class settlement as to the second class and dismissed the claims of Hickey and Jackson and the class represented by them. (Dkt. No. 248).

On June 2, 2005, the Ninth Circuit issued its opinion in the Menotti case, which affirmed Judge Rothstein's dismissal of Plaintiffs' facial challenge to the constitutionality of Emergency Order No. 3, but remanded the case for further proceedings as to the constitutionality of the order as applied to Plaintiffs. Menotti v. City of Seattle, 409 F. 3d 1113, 1148 (9th Cir. 2005). The Menotti court determined that Plaintiffs had raised genuine issues of material fact requiring trial as to whether "it was the policy of the City to apply Order No. 3 in a manner that excluded only anti-WTO protestors." Id. at 1148. The court found there to be genuine issues of material fact regarding both whether the Westlake Park arrests resulted from "discriminatory enforcement of a speech restriction

ORDER - 5

amounting to viewpoint discrimination in violation of the First Amendment," id. at 1147, and whether that viewpoint reflected a City policy. Id. at 1148 & n.67. The court thus reversed the decision of the district court and remanded for trial on the as-applied constitutional challenge.

The Menotti court also reversed Judge Rothstein's order denying class certification and remanded that issue to the district court for reconsideration. Id. at 1148. The five Plaintiffs from this action requested to have the remainder of their case proceed separately from the remand in the Menotti case, because they claimed that Menotti is much closer to trial than this case. (See Joint Status Report, Dkt. No. 259). On May 17, 2006, pursuant to a joint stipulation, Plaintiffs filed a Second Amended Complaint that alleged claims under the federal and state constitutions for false arrest and violations of free speech rights. (Dkt. No. 298-1). On June 5, 2006, this Court granted class certification and defined the class as:

> All individuals arrested between 6 am and 12 pm on December 1, 1999, in Seattle, Washington, in Westlake Park, or on the streets or sidewalks on Fourth Avenue, between Pike Street and Pine Street, or on Pike or Pine Streets between Fourth and Fifth Avenues.

(Dkt. No. 303).

Both parties now move for summary judgment. Plaintiffs move for partial summary judgment on the issue of whether the city had individualized probable cause to arrest the class members. The City has moved for summary judgment on all claims.

**DISCUSSION**

**I.   Summary Judgment Standard**

This matter comes before the Court on cross motion for summary judgment. Summary judgment is not warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show

initially the absence of a genuine issue concerning any material fact. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. <u>Id.</u> at 324.

When the parties file cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." <u>Fair Housing Council of Riverside County v. Riverside Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting CHARLES ALAN WRIGHT, ET AL., 10A FEDERAL PRACTICE AND PROCEDURE § 2720, at 335-36 (3d ed. 1998)). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." <u>Riverside Two</u>, 249 F.3d at 1136.

"When the moving party does not bear the ultimate burden of persuasion at trial, the moving party must show that the nonmoving party does not have enough evidence to carry its burden at trial." <u>Block v. City of Los Angeles</u>, 253 F.3d 410, 416 (9th Cir. 2001).

**II.    Summary Judgment on Issue of Probable Cause**

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment provided that the arrest was made without probable cause or other justification." <u>Dubner v. City and County of San Francisco</u>, 266 F.3d 959, 964 (9th Cir. 2001). Making out a claim for unlawful arrest involves a burden shifting analysis:

> Although the plaintiff bears the burden of proof on the issue of unlawful arrest, she can make a prima facie case simply by showing that the arrest was conducted without a valid warrant. At that point, the burden shifts to the defendant to provide some evidence that the arresting officers had probable cause for a warrantless arrest. The plaintiff still has the ultimate burden of proof, but the burden of production falls on the defendant. If the defendant is unable or refuses to come forward with any evidence that the arresting officers had probable cause and the plaintiff's own testimony does not establish it, the court should presume the arrest was unlawful.

ORDER - 7

Id. at 965 (internal citations omitted). Probable cause exists when " 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" Hart v. Parks, 450 F.3d 1059, 1065-66 (9th Cir. 2006) (quoting Bailey v. Newland, 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964))). "Police must only show that, under the totality of the circumstances, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." Id. at 1066 (internal quotation marks omitted). A warrantless search or seizure ordinarily must be based on individualized suspicion of wrongdoing. City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000). The Court must piece together the totality of the circumstances known to the officers at the time based on the field arrest report, the officers' testimony, the plaintiffs' testimony, and any other undisputed facts. Dubner, 266 F.3d at 966; Wash. Mobilization Comm. v. Cullinane, 566 F.2d 107, 121 (D.C. Cir. 1977) (noting that an arrest is presumed invalid if not accompanied by a field arrest form but that the presumption could be rebutted "upon an affirmative showing by [the prosecution] that any particular arrest was based on probable cause"); see also Beck v. Ohio, 379 U.S. 89, 91 (1964) (making clear that focus is on what the officer knew "at the moment the arrest was made").

In this case, all of the arrests were made without a warrant. The City therefore bears the burden of production on the issue of probable cause. Dubner, 266 F.3d at 965.

As in the case of the First & Broad plaintiffs, the arrest "documentation in this case is atrocious." (See Dkt. No. 184 at 19). Each arrest form has the same hand-written, photocopied statement that says: "Lt. Whelan gave orders to disburse [sic] from Westlake Park. All refused to leave and were blocking the sidewalks. No photo taken in field due to number of arrestees. Refused to get off transport bus at Sandpoint Prisoner Processing Station." These arrest forms are inaccurate for a number of reasons. Lieutenant Whelan stated in deposition that he never gave an order to disperse at Westlake Park and had no knowledge of any such order. (Weaver Decl., Exh. A (Whelan Dep. at 21)). And the City admitted at oral argument that no order to disperse was ever given in

ORDER - 8

Westlake Park. The video of the arrests submitted by Plaintiffs in support of their motion shows that the class members were seated in the middle of Westlake Park and were not even near the sidewalks. (See Weaver Decl., Ex. L). The video also indicates that many officers were available to help process and photograph arrestees. Like in its previous Order, "the Court wonders how [147] arrestees is such a great number that pictures could not be taken." And the officer who prepared the arrest records for the class members admitted in deposition that he was not present at the arrest, did not talk to any officer present at the arrests, and did not talk to officers who were at the scene to confirm that the arrest report was accurate. (Weaver Decl., Exh. U (Stephen Dep.), 18:18-19:8, 21:1-24:5, 25:3-35:19, 41:2-42:18). Finally, both Lt. Whelan's arrest report and then-Captain Pugel's declaration fail to present any individualized evidence about any of the class members. (See Weaver Decl., Exh. C; Pugel Decl.). The City's proffered field evidence therefore fails to support individualized probable cause to arrest.

Nevertheless, the City argues that its officers had probable cause to arrest the individuals in Westlake Park for failing to obey Order No. 3 because other evidence shows that: (1) the entire class was inside the perimeter of the restricted zone; (2) the class sat down, many with arms linked, after police surrounded them; (3) the police arrested those surrounded; and (4) the class clearly understood that they were violating the order. (Defendant's Resp. at 2).

Plaintiffs argue that the City cannot carry its burden as to the crime of violating a mayoral emergency order because (1) the arresting officers did not investigate whether any of the class members fell under the exceptions to the emergency order, and (2) the City has presented no evidence suggesting that there was probable cause to believe that the class members knew they were violating Order No. 3.

Addressing the exceptions issue first, the City has presented no evidence suggesting that officers attempted to determine whether any of the class members fell within any of Order No. 3's exceptions. Instead, the City argues that the law does not require officers to "dispel all possible defenses" or "explore and eliminate every claim of innocence" before making an arrest. The City

ORDER - 9

cites <u>Baker v. McCollan</u> and <u>Erdman v. Cochise County</u> for this proposition. In <u>McCollan</u>, the Supreme Court considered whether a sheriff violated a suspect's due process rights when he executed a facially valid arrest warrant despite the suspect's (valid) protests of mistaken identity. The Court held that the Constitution does not require "a sheriff executing an arrest warrant . . . to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." <u>Baker v. McCollan</u>, 443 U.S. 137, 145-46 (1979). Citing <u>McCollan</u>, <u>Erdman</u> held that the incarceration at issue — where the county had erroneously transferred and detained the plaintiff for a previously adjudicated crime — was constitutional because it occurred pursuant to a facially valid arrest warrant. <u>Erdman v. Cochise County</u>, 926 F.2d 877, 882 (9th Cir. 1991). <u>McCollan</u> and <u>Erdman</u> are thus not cases about whether officers had adequate suspicion to support probable cause, but whether officers who did have probable cause (pursuant to valid warrants) needed to investigate, for due process purposes, claims of innocence. These cases are therefore inapposite to the question of whether the law requires that the officers in this case investigated — for purposes of probable cause — whether the class members fell within any of Order No. 3's exceptions.

   The City also argues that a reasonable officer would have believed that these individuals did not fall within one of the exceptions because they sat down. The City's argument suggests that "sitting" indicates "protesting." But Order No. 3 did not prohibit "protestors"; it prohibited anyone except those who fell within the exceptions. It is possible that individuals who fell within the exceptions were also protesting. And while individuals may have sat in an act of protest, they may also have sat because they were scared or because they wanted to communicate to the police that they were not resisting arrest. The City cannot rely on the fact that class members sat to establish that officers knew at the time that class members did not fit within any of Order No. 3's exceptions.

   <u>Barham v. Ramsey</u>, 434 F.3d 565 (D.C. Cir. 2006), is instructive here. In that case, the D.C. Circuit considered whether police had probable cause to arrest a large group of demonstrators where they believed that some of the demonstrators had committed arrestable offenses. <u>Barham</u>, 434 F.3d

ORDER - 10

at 573. The court concluded that the officers could not arrest all demonstrators based on the belief that some had committed a crime; it concluded that the officer who ordered the arrest was not entitled to qualified immunity because he "offered no facts capable of supporting the proposition that [he] had reasonable, particularized grounds to believe every one of the 386 people arrested was observed committing a crime." Barnham, 434 F.3d at 574.

The City argues that Barnham is not applicable here because all of the class members were arrested in the restricted zone. The City's argument assumes that everyone physically present in the restricted zone was committing a crime. But Order No. 3, which prohibited presence in the downtown core, did not apply to many groups of people, including residents, business owners, employees, and shoppers. People who fell within the exceptions were therefore not committing a crime by being present in the restricted zone. Thus, like in Barnham, without individualized investigation, the officers could not distinguish which of the protestors had committed or were committing arrestable offenses.

As Barnham and other cases make clear, individualized suspicion of wrongdoing is required for probable cause. See City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000); Barnham, 434 F.3d at 573 ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). Because the officers did not investigate whether any of the class members were shoppers or residents or employees of downtown businesses, they could not have had a reasonable suspicion that each and every class member was prohibited under Order No. 3 from being physically present in the restricted zone.

Second, the City cannot meet its burden of showing that the officers had reason to believe that the class members knew they were violating the emergency order. The City argues that the officers had probable cause as to the crime of failing to obey Order No. 3. (Def. Resp. at 7). Order No. 3 prohibited any person, except persons who fell within one of the order's exceptions, from entering or remaining in the limited curfew area. (See Order No. 3, Cobb Decl. at 2, Exh. C). Under Seattle Municipal Code (SMC) 10.02.110, "[i]t is unlawful for anyone to fail or refuse to obey an order

ORDER - 11

proclaimed by the Mayor pursuant to the provisions of this chapter." "Failure to obey" is defined in the Code: "A person is guilty of failure to obey the Mayor's emergency order when he or she <u>knowingly</u> violates any order issued under SMC 10.02.010 or 10.02.020." SMC 12A.26.040 (emphasis added). It is undisputed that Order No. 3 was a mayoral emergency order issued under the Code. Thus, a person committed the crime of failing to obey Order No. 3 if she (a) actually violated the order and (b) had knowledge, when she entered or remained in the restricted zone, that she was violating the order.

Even though the operative ordinance requires a knowing violation of the order, the City argues that it does not need to provide evidence showing that officers knew that the class members knew they were violating the order. The City rests its argument on the propositions that "probable cause does not require a showing of any specific claimant's mens rea", (Resp. at 6), and that ignorance of the law is not a defense.

But in a case like this one, where the crime is defined as requiring a "knowing violation", "the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." See <u>Easyriders Freedom F.I.G.H.T. v. Hannigan</u>, 92 F.3d 1486, 1499 (9th Cir. 1996). In <u>Easyriders</u>, the Ninth Circuit considered whether officers had probable cause when they issued citations to motorcyclists with non-conforming helmets without inquiring whether the motorcyclists knew that their helmets were not in compliance with the helmet law. The applicable helmet law provided that a rider was in violation of the helmet law if (a) his helmet did not bear a federal certification sticker or (b) the helmet did bear a certification sticker but did not conform to federal safety standards <u>and</u> the person being cited had actual knowledge of the non-conformity with federal standards. <u>Id.</u> at 1492, 1499. The court noted the general rule that "an officer need not have probable cause for every element of the offense." <u>Id.</u> at 1499. But the court concluded that "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." <u>Id.</u> Thus the court concluded that the California Highway Patrol "must have specific probable cause to believe that a motorcyclist has

ORDER - 12

actual knowledge of a helmet's non-compliance to cite that motorcyclist for violating the helmet law." Id.

Likewise, the Seattle officers must have had "specific probable cause to believe that" class members had "actual knowledge" of their non-compliance with Order No. 3. See Easyriders, 92 F.3d at 1499. The City argues that two of the named plaintiffs and one of the class members now "admit that they knowingly entered the restricted area aware that by so entering they were violating the terms of the Order." (Def. Resp. at 4). But that fact is irrelevant because the focus of the probable cause inquiry is what the officers knew or believed at the time of the arrest. See Beck v. Ohio, 379 U.S. 89, 91 (1964). Whether or not some of the class members knew about the emergency order or knew they were violating it does not answer the question of whether the officers believed that the class members knew they were violating Order No. 3.

Because the City has not pointed to any evidence indicating that the arresting officers had knowledge or a belief at the time of the arrests that class members had knowledge of Order No. 3 or knowledge of their violation of that emergency order, the City cannot carry its burden as to probable cause.

The Court notes that the City's probable cause argument would be much stronger had the officers given an order to disperse at Westlake Park before arresting the class. See Barnham, 434 F.3d at 575 ("[W]hen compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order."); Cullinane, 566 F.2d at 121 ("If all members of a group are arrested the prosecutor may well be able to prove, by the testimony of policemen who were at the scene, that there was probable cause to believe that the group as a whole was violating the law . . . by remaining on the scene after reasonable notice and opportunity to disperse."); Jackson v. City of Seattle, Case No. 05-2034JLR at 5:26-27 (W.D. Wash., Oct. 20, 2006) (concluding that officers did not have probable cause to arrest man for violating criminal trespass statute which required knowledge of unlawful entry without giving him a prior warning or opportunity to explain

ORDER - 13

his presence); see also Paff v. Kaltenback, 204 F.3d 425, 437 (3d Cir. 2000) ("Absent a confession, the officer considering the probable cause issue in the context of a crime requiring a *mens rea* on the part of the suspect will always be required to rely on circumstantial evidence regarding the state of his or her mind. Ordinarily, information supporting a conclusion that the potential defendant in a trespass case was not licensed or privileged and that he was so advised by the custodian of the property will provide sufficient circumstantial evidence to constitute probable cause on the *mens rea* element."). Had the arresting officers given an order to disperse that explained the content of the mayoral emergency order, and had the class members remained in Westlake Park, the officers would have had circumstantial evidence supporting an individualized suspicion that each of the remaining class members were not permitted in the restricted zone and were knowledgeable about their violation.

Moreover, the municipal code requires the mayor to communicate the content of any emergency order to the governor, news media, and the public:

> The Mayor shall cause each proclamation or order issued by him pursuant to the authority of this chapter to be delivered to the Governor of the state and, to the extent practicable, to all news media within the City, and shall utilize as many other available means, including, but not limited to, posting on public facilities and public address systems, as may be practical to use, in order to give the widest dissemination of such proclamations and orders to the public.

SMC 10.02.100. The City has pointed to no evidence suggesting that it complied with SMC 10.02.100 on the morning of December 1, 1999. Had the City communicated to the class the content of Order No. 3 by posting the order in and around Westlake Park, the officers would have had a reasonable belief that the class members had knowledge of their violation.

And the Court notes that the crime — failure to obey — presumes that a suspect is given an opportunity to obey. Without being informed by the officers of the content of Order No. 3, the arrestees were not given a reasonable opportunity to obey the mayoral order.

Finally, the Court concludes that Menotti left open the question of whether there was probable cause to arrest these individual plaintiffs. The City argues that the Menotti decision forecloses Plaintiffs' probable cause argument because the Menotti court found that officers had probable cause to arrest another plaintiff — Mr. Skove — because "by engaging in protest inside the

ORDER - 14

restricted zone without evidence that he was exempt, Skove had violated Order No. 3." Menotti, 409 F.3d at 1153. But the City ignores a key fact about the officer's stop of Mr. Skove: as the City explained in its brief to the Ninth Circuit in Menotti, an officer contacted Mr. Skove on December 2, 1999, as he entered the restricted zone and communicated to him the content of the emergency order. Mr. Skove responded that he did not "take orders from Mayor Schell." (Defendant's Response to Appellant's Opening Brief at 59). Given Mr. Skove's response, the Ninth Circuit understandably concluded that Mr. Skove was not exempt from the emergency order. But the facts surrounding the arrests of these class members are distinguishable. Because probable cause is an individualized inquiry, the Menotti court's discussion of a different individual who was stopped by different officers on a different day is inapposite to whether officers had individualized suspicion of wrongdoing as to Plaintiffs.

In summary, the Court disagrees with the City that class members' mere presence in Westlake Park while protesting provided officers with probable cause to arrest. To conclude otherwise would erode the Fourth Amendment's fundamental requirement that searches and seizures be based on individualized suspicion of wrongdoing. See Edmond, 531 U.S. at 37. Because these basic protections are not suspended during mass protest situations, see Barnham, 434 F.3d at 573, and Sullivan v. Murphy, 478 F.2d 938, 966-67 (D.C. Cir. 1973), and because the City has not shown that it has any evidence suggesting that officers knew whether Plaintiffs were exempted from Order No. 3 or that officers knew that Plaintiffs knew they were violating the Order, the Court concludes that the officers did not have individualized probable cause to arrest the class members. The Court therefore GRANTS Plaintiffs' motion for partial summary judgment on the issue of probable cause.

The Court also grants summary judgment as to whether the officers had probable cause regarding the crimes of failure to disperse and pedestrian interference. Because the City never gave an order to disperse at Westlake Park, the City cannot carry its burden as to the crime of failure to disperse. Moreover, by not arguing in its opposition that officers had probable cause to arrest the class for violating Seattle's pedestrian interference ordinance, the City has abandoned any claim that

ORDER - 15

the class was properly arrested for that crime. And even if it had preserved this argument, the City has not presented any evidence even suggesting that class members were intentionally obstructing pedestrian or vehicular traffic when they were seated in Westlake Park. See SMC 12A.12.015(B).

## II.     Claim of City Policy of Viewpoint Discrimination

The City has moved for summary judgment on Plaintiffs' as-applied constitutional challenge. Specifically, the City argues that Plaintiffs cannot point to any evidence that shows that the class was arrested because of an anti-WTO message or that any such viewpoint discrimination was based on a City policy specifically discriminating against anti-WTO protestors. (Def. Mot. at 3, 14). But, in remanding this case, the Ninth Circuit held that there were genuine issues of material fact regarding both of these issues. Menotti, 409 F.3d at 1148. As to the issue of whether the arrests were the product of viewpoint discrimination, the Ninth Circuit determined that Plaintiffs had raised genuine issues requiring trial. Considering Ken Hankin's testimony, in which he testified that he and others were arrested without warning or any determination of whether they fell within any of Order No. 3's exceptions, the court concluded that "Hankin's testimony is evidence that the arrest of this group of persons was a 'discriminatory enforcement of a speech restriction amounting to viewpoint discrimination in violation of the First Amendment.' " Menotti, 409 F.3d at 1146-47 (quoting Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998)). The court also stated that "viewing the evidence in the light most favorable to Appellants, in some instances police conduct may have gone too far and infringed certain individual protestors' constitutional rights by making the content of their expressed views the test for their entry into the restricted zone." Id. at 1156. Thus, the Ninth Circuit held that a trial was necessary to resolve the fact issues regarding viewpoint discrimination.

As to the issue of whether the City had a policy of viewpoint discrimination, the court stated:

> The statements of Assistant Chief Joiner and the declarants, taken in the light most favorable to Appellants, create a genuine issue of material fact as to whether it was the policy of the city to apply Order No. 3 in a manner that excluded only anti-WTO protestors. Viewing the evidence in the light most favorable to the Hankin plaintiffs, such a policy may be inferred due to the widespread practices or evidence of repeated constitutional violations and the absence of evidence that police officers were discharged or reprimanded for making the discard of anti-WTO expressive materials an entry ticket to the restricted zone.

ORDER - 16

Menotti, 409 F.3d at 1148 (internal quotation marks omitted). Thus the court "reverse[d] the district court's grant of summary judgment to the City on the constitutionality of Order No. 3 as applied to the Hankin plaintiffs, and . . . remand[ed] this issue for trial." Id.; see also id. at 1156 ("We reverse and remand to the district court the Hankin plaintiffs' as-applied challenge to Order No. 3, as well as the issue of class certification. . . . On the record before us, we conclude that trial of disputed facts is necessary on the claims for which we reverse and remand."). Thus, the Menotti court identified genuine issues of material fact regarding whether the City had a policy of only applying Order No. 3 to anti-WTO protestors.

Because the Ninth Circuit has already ruled that Plaintiffs have raised enough fact issues to survive summary judgment, the Court will not consider the City's argument that Plaintiffs cannot meet their burden of showing a City policy of viewpoint discrimination. See Richardson v. United States, 841 F.2d 993, 996 (9th Cir. 1988) ("Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." (internal quotation marks and citations omitted)). The City's motion in this regard is therefore DENIED.

### III.  Claim Under Washington State Constitution

The parties dispute whether any claims under the Washington State Constitution remain. Plaintiffs' Second Amended Complaint alleges claims for false arrest and violation of constitutional rights under the Washington State Constitution. But as the City points out, the Ninth Circuit did not remand Plaintiffs' as-applied challenge under the state constitution. Although Judge Rothstein ruled on the state claims, (Dkt. No. 77) and although Plaintiffs raised the as-applied issue to the Ninth Circuit, (see Plaintiffs' Opening Brief to the Ninth Circuit at 1), the Ninth Circuit "view[ed] [the state] claims as a facial challenge" and concluded that the district court correctly dismissed Plaintiffs' challenge to the validity of Order No. 3 under the Washington State Constitution. Menotti, 409 F.3d at 1143 n.57.

ORDER - 17

The City argues that because the Ninth Circuit did not address the as-applied state claims and because no state claims have been remanded, Judge Rothstein's order dismissing the as-applied claims under the state constitution stands. Under the law of the case doctrine, "on remand a lower court is bound to follow the appellate court's decision as to issues 'decided explicitly or by necessary implication.' " United States v. Garcia-Beltran, 443 F.3d 1126, 1129 (9th Cir. 2005) (quoting Liberty Mut. Ins. Co. v. EEOC, 691 F.2d 438, 441 (9th Cir. 1982)). In Liberty, the Ninth Circuit addressed the application of the law of the case doctrine to a situation where the appellate court was silent as to an appealed issue:

> Although in its previous appeal the state contested the district court's denial of costs, our prior disposition awarded the state only its costs on appeal. The disposition was completely silent as to the issue of costs in the district court. Liberty argues that this silence amounts to an implicit denial of costs in the district court. There is no reason, however, why our earlier silence did not simply leave the matter of costs open for consideration by the district court on remand. See Perkins v. Standard Oil of California, 399 U.S. 222, 223, 90 S. Ct. 1989, 1990, 26 L. Ed. 2d 534, 536 (1970) (per curiam) ("Our failure to make explicit mention in the mandate of attorneys' fees simply left the matter open for consideration by the District Court, to which the mandate was directed."). Thus, we hold that the law of the case did not require the district court to grant Liberty's [request that it deny a cost award].

Liberty, 691 F.2d at 441-42. The situation here is very similar to that in Liberty. Here, Judge Rothstein dismissed the as-applied claim under the state constitution, Plaintiffs raised the issue in their appeal to the Ninth Circuit, and the Ninth Circuit remanded the federal as-applied challenge but did not mention the state as-applied challenge.[4] Under Liberty, the Court interprets the Menotti court's silence as "simply leav[ing] the matter . . . open for consideration by the district court on remand." Liberty, 691 F.2d at 441. The Court therefore DENIES Defendant's request that the Court dismiss Plaintiffs' as-applied challenge under the Washington State Constitution.

---

[4] The Menotti court stated that it viewed the claims under the Washington State Constitution "as a facial challenge." Menotti, 409 F.3d at 1143 n.57. The one footnote in which the state claims are mentioned is in the section dealing with the facial challenge. See id. at 1143. The Court does not believe that the Ninth Circuit was also addressing Plaintiffs' as-applied challenge as part of the facial challenge.

ORDER - 18

### IV.     Motion to Strike

Finally, the City argues in its Reply that the Court should strike Plaintiffs' Response as overlength. In an earlier order, the Court granted Plaintiffs leave to file an overlength brief based on Plaintiffs' assertion that they could not adequately discuss all of the factual issues raised in Defendant's motion in the standard twenty-four pages. (Dkt. No. 339). The City argues that Plaintiffs did not use the extra length for the reason requested, and that they use smaller font and spacing than is typical. In a Surreply, Plaintiffs respond that they used the extra space to incorporate the myriad facts into the body of the Response as opposed to writing a lengthy statement of facts. (Dkt. No. 353-1).

The Court declines to strike Plaintiffs' Response. The document contains ample fact recitations, and it is not material that those recitations were not incorporated in a "fact" section. Moreover, Plaintiffs state that their brief uses 12-point font and the "exactly 24 point" spacing. (Weaver Decl. ¶ 4). Because no rule requires a certain font size or spacing, because Plaintiffs have stated that they used a typical spacing and font size, and because Plaintiffs' Response incorporates substantial factual recitations, the Court DENIES Defendant's motion to strike.

### CONCLUSION

Because the City cannot carry its burden to show that the arresting officers had individualized suspicion of wrongdoing on the part of the class, the Court GRANTS Plaintiffs' motion for partial summary judgment on the issue of probable cause. And because the <u>Menotti</u> court specifically remanded for trial on the issue of whether it was the policy of the City to apply Order No. 3 in a manner that excluded only anti-WTO protestors, the Court DENIES Defendant's motion for summary judgment on Plaintiffs' as-applied challenge to Order No. 3. The Court also DENIES Defendant's motion for summary judgment as to the state constitutional claim. And the Court DENIES Defendant's motion to strike.

This case is scheduled for trial beginning January 8, 2007. As the Court stated at oral argument, the Court questions whether, given the Court's conclusion on the probable cause issue, any

ORDER - 19

issues remain for trial on the liability portion of the case. As the Court asked the parties at oral argument, "what damages flow from Plaintiffs' First Amendment claims that would not be recovered through the false arrest claims?" The Court requests that the parties provide the Court with briefing on this issue by noon on Monday, December 18, 2006. The briefs may be no longer than six (6) pages in length, and no responses will be permitted.

Dated this 13th day of December, 2006.

_____
Marsha J. Pechman
United States District Judge

ORDER - 20